IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| | ) CRIMINAL ACTION NO. 05-17 J |
| v. | ) |
| | ) JUDGE GIBSON |
| RODNEY HANTON, | ) |
| | ) |
| Defendant. | ) |

## Memorandum Opinion and Order of Court

**GIBSON, J.**

This matter comes before the Court on the Defendant's Motion to Suppress (Document No. 22). The Court conducted a suppression hearing on November 22, 2005. For the reasons stated herein, the Defendant's Motion is granted in part and denied in part.

**FINDINGS OF FACT**

1. On July 28, 2004, at 2:00 A.M., Trooper Berkebile was alone and monitoring westbound vehicular traffic on the Pennsylvania Turnpike (hereinafter "Turnpike") at mile post 123.5, which is located outside of the eastern end of the Allegheny Tunnel (hereinafter "Tunnel") from his vehicle that was parked alongside the Turnpike. Transcript (hereinafter "T."), pp. 5, 7.

2. At the point where Trooper Berkebile has parked his vehicle, he could observe the point where the Turnpike merged from three lanes into two lanes of traffic at a location approximately one-quarter to one-half of a mile prior to the westbound traffic entrance into the Tunnel. T., p. 5.

3. The posted speed limit for this area of the Turnpike, at the time in question, was fifty-five miles per hour. T., pp. 5-6, 55.

4. At this time, Trooper Berkebile noticed a vehicle "traveling faster than the flow of traffic" in the left lane of traffic and therefore he pulled his vehicle onto the Turnpike and followed that vehicle into and through the Tunnel timing the vehicle's speed for

      three-tenths of a mile, although he followed the Defendant for a total of one and one-half miles. T., pp. 6, 34, 79.

5. Trooper Berkebile, utilizing the speedometer in his unmarked vehicle, "clocked" the vehicle he was following, a gold Chevrolet Malibu sedan, at sixty-five miles per hour. T., pp. 7, 28.

6. Trooper Berkebile had a "radar unit" available to him on the night of the traffic stop, but chose not to take it with him. T., pp. 26-27.

7. Trooper Berkebile initiated a traffic stop of the speeding vehicle by activating his emergency lights and siren after exiting the Tunnel and, in response, the operator of the Malibu pulled the vehicle over. Trooper Berkebile conducted the traffic stop at mile post 122 of the westbound lanes of the Turnpike. T., p. 7.

8. Trooper Berkebile then exited his patrol vehicle and approached the operator of the Malibu, who was the Defendant, and identified himself to the Defendant and indicated to him that he had been stopped for speeding at sixty-five miles per hour in a fifty-five miles per hour zone and that he needed to produce his driver's license and registration. T., p. 8.

9. The Defendant produced the required documents as well as his rental car agreement and in response to Trooper Berkebile's questioning, the Defendant stated he was traveling from Philadelphia to Pittsburgh after attending the funeral of a friend, whose name he "couldn't provide." T., pp. 9, 10, 28, 80.

10. During the traffic stop, Trooper Berkebile, based upon his training and experience, recognized the smell of raw marijuana emanating from the Malibu; Trooper Berkebile did not smell burnt marijuana when approaching the Malibu, but did detect the smell of raw marijuana. T., pp. 9, 43.

11. Trooper Berkebile also recognized "multiple" cellular telephones within his plain view "laying in the passenger seat" as well as the fact that the Defendant remained "overly nervous" throughout the traffic stop, despite the fact Trooper Berkebile used a conversational type of voice and did not pull his firearm. T., pp. 9, 10, 11.

12. Trooper Berkebile returned to his vehicle with the documentation produced by the Defendant and ran a records check on the Defendant which revealed that the Defendant had previously been arrested on "drug-related charges." T., pp.11-13.

13. Thereafter, Trooper Berkebile contacted Sergeant Anthony DeLuca who soon arrived at the location of the traffic stop and parked his unmarked vehicle to the right of Trooper Berkebile's vehicle while Trooper Berkebile explained to Sergeant DeLuca what was occurring. T., pp. 13, 47.

14. Upon Sergeant DeLuca's arrival, Trooper Berkebile was in his vehicle and Sergeant DeLuca parked his vehicle with the driver's side door adjacent to the passenger's side door of Trooper Berkebile's vehicle; both Troopers rolled their windows down and Trooper Berkebile related to Sergeant DeLuca that the Defendant was coming from Philadelphia, a strong odor of raw marijuana was coming from his vehicle and that the Defendant had a criminal history involving narcotics. T., p. 48.

15. Trooper Berkebile then approached the Defendant's vehicle and requested with a conversational tone of voice that he exit the vehicle and follow Trooper Berkebile to the area between the rear of the Defendant's vehicle and front of Sergeant DeLuca's vehicle, which the Defendant did and Trooper Berkebile issued a written warning to the Defendant and returned all of his documents. T., pp. 14, 82, 88.

16. While being issued his warning, the Defendant still demonstrated a sign of nervousness: his hands were shaking. T., pp. 14-15.

17. The traffic stop lasted no more than twenty minutes. T., p. 36.

18. Trooper Berkebile and Sergeant DeLuca were in uniform which displayed patches indicating their positions as Pennsylvania State Police Troopers. T., p. 30.

19. Trooper Berkebile had never spoken to or been in the presence of the Defendant so as to know his normal disposition. T., p. 31.

20. Trooper Berkebile does not recall whether the Defendant demonstrated that he had glassy eyes, that he staggered or had "impaired balance", or slurred his words and he also indicated that he did not conduct any field sobriety tests. T., p. 32.

21. Trooper Berkebile also noted that the Defendant's vehicle was never driven in an "erratic manner", that the Defendant obeyed Trooper Berkebile's lights and sirens and pulled off the Turnpike. T., p. 33.

22. After handing the Defendant a warning notice Trooper Berkebile then told the Defendant that he was free to leave and both of them began walking toward their respective vehicles until Trooper Berkebile turned and asked the Defendant, in his same conversational tone, if he could ask him a few questions. T., pp. 15-16, 40, 41, 42, 48.

23. The Defendant indicated that Trooper Berkebile could ask him a few questions. T., pp. 15, 42.

24. At this time, Sergeant DeLuca possessed an unvoiced intention to keep the Malibu parked and not to let the Defendant drive it away, but instead search it for contraband along with Trooper Berkebile, with or without the Defendant's consent. T., p. 63.

25. Trooper Berkebile then indicated to the Defendant that on the Turnpike there is a problem with "weapons, large amounts of cash, [and] illegal drugs" and that Philadelphia is a "major distribution point of illegal narcotics" and that the Defendant was not necessarily "doing anything wrong" but Trooper Berkebile stated that he "wouldn't be doing [his] job if [he] didn't ask [the Defendant] if [he] could check the vehicle for contraband." T., pp. 16, 42, 83.

26. Sergeant DeLuca was located behind Trooper Berkebile at the left front fender of his vehicle and the Defendant was standing between his vehicle and Trooper Berkebile's vehicle; the Defendant stood "near the trunk of his vehicle." T., pp. 16, 17, 48.

27. The Defendant indicated that he did not want Trooper Berkebile to search his vehicle because he was in a "hurry." The Defendant indicated this decision again when Trooper Berkebile inquired a second time for permission to search. T., pp. 17, 42-43, 60-62, 83.

28. Trooper Berkebile then indicated that he smelled "the odor of marijuana coming from [the Defendant's] vehicle." T., p. 17. Sergeant DeLuca at this time had not smelled the "raw marijuana" because of his position in relation to the Defendant's rental car. T., pp. 58, 63-64.

29. The Defendant responded by stating he was smoking marijuana earlier when he was driving and then "produced a half burnt marijuana blunt from his sock"; the Defendant handed this "blunt" to Trooper Berkebile. T., pp. 17, 50-51.

30. Before and during the Defendant's revelation of the "blunt", Trooper Berkebile and Sergeant DeLuca did not have their weapons drawn, did not make any show of force or touch the Defendant in any way. T., pp. 18, 50, 59, 88.

31. At this time, Trooper Berkebile told the Defendant that he was under arrest for "suspicion of driving under the influence of a controlled substance" and simple possession of marijuana. T., pp. 18, 51.

32. The Defendant was placed in handcuffs and "placed" in Trooper Berkebile's vehicle. T., p. 18.

33. A search incident to the arrest of the Defendant revealed an amount of approximately $2000 cash. T., p. 19.

34. The Defendant was then transported to the Somerset Hospital where he consented to providing a urine sample for urinalysis pursuant to Pennsylvania law; the Defendant was not read his Miranda rights at this time. T., p. 19.

35. Trooper Michael Volk, the Somerset Troop's "Intel Officer," responded to a call from Trooper Berkebile by meeting Trooper Berkebile at Somerset Hospital at approximately 2:55 A.M.; at which time the Defendant was in the process of providing a urine sample. T., pp. 21-22, 66.

36. The Defendant was orally advised of his *Miranda* rights at Somerset Hospital, after he provided a urine sample: Trooper Volk introduced himself and at this time read the Defendant his Miranda rights in the presence of Trooper Berkebile; the Defendant then orally stated that he waived his rights and answered Trooper Volk's questions regarding "his trips" and "the vehicle." T., pp. 20, 22, 43, 67.

37. The Defendant made a statement that he was returning from Philadelphia where he attended the funeral of a friend whose name he could not remember and denied possessing "raw" marijuana. T., pp. 22, 68; Exhibit 1.

38. The Defendant's Malibu remained at the scene of the traffic stop being watched by Sergeant DeLuca who waited for the tow truck to arrive and take the Malibu to the Somerset State Police Barracks. T. p. 20.

39. A K-9 unit from the Ligonier Township Police Department was called to the Somerset State Police Barracks and conducted a "scan" of the exterior of the Malibu and the K-9 handler, Officer Esalary stated that his K-9 partner made a "positive indication on the vehicle"; the "scan" occurred approximately at 4:00 A.M. July 28, 2004. T., pp. 21, 51, 52.

40. Trooper Berkebile related to Trooper Volk the information known to him at that time , and Trooper Volk completed and submitted an application for a search warrant and an affidavit of probable cause for a search warrant of the Defendant's Malibu based upon this information of a positive indication from a certified drug detecting K-9 officer and drug dog who searched the exterior of the Malibu; the search warrant was issued at 6:03A.M. on July 28, 2004. T., pp. 21, 29, Exhibit 1.

41. After the search warrant was executed for the Malibu, the following items were discovered: approximately 12 pounds of marijuana, a loaded .40 caliber pistol, extra

       magazines for this pistol, a large knife, approximately $700 in cash, and "several digital scales." T., pp. 23-24.

42. Because of the amount of marijuana seized, Sergeant DeLuca was required to and did contact the Western Interdiction Office in Pittsburgh and in response, Trooper Ed Walker arrived at the Somerset State Police Barracks at approximately 5:00 A.M. T., pp. 24, 54.

43. Troopers Berkebile and Volk conveyed to Trooper Walker upon his arrival what had previously occurred, including the substance of the interview at the hospital and the fact that the Defendant was previously read and waived his *Miranda* rights. T., pp. 25, 68-69.

44. The Defendant was thereafter interviewed again by Trooper Walker at approximately 7:05 A.M. at the State Police Barracks in Somerset, Pennsylvania. T., pp. 25, 68, 69, 70, 76.

45. Neither Trooper Walker or Trooper Volk read the Defendant his *Miranda* warnings again prior to the interview conducted by Trooper Walker; Trooper Volk observed this interview, but did not participate. T., pp. 68, 72-73.

46. The Defendant related to Trooper Walker that there was no funeral, that he went to Philadelphia to purchase marijuana for himself and not for anyone else in Pittsburgh and that he would not reveal his marijuana supplier in Philadelphia. T., p. 69.

47. Following this second interview of the Defendant, a second search warrant was obtained for the Defendant's apartment, but the circumstances of that search warrant were not explored in the testimony at the hearing and only briefly mentioned in the Defendant's Motion (Document No. 22) and not mentioned in the Defendant's Post-Hearing Brief. T., p. 71.

## CONCLUSIONS OF LAW

1. The Court finds that there exists no evidence of record that the traffic stop of the Defendant was racially motivated and further finds no evidence of record that the evidence gleaned from that traffic stop, the subsequent mere encounter with Trooper Berkebile, the Defendant's arrest, the search of the Malibu, and the statements of the Defendant during his first interview should be suppressed.

2. Probable cause must exist in order to justify the traffic stop of a motor vehicle because a stop of a motor vehicle "constitutes a 'seizure' of 'persons' within the meaning of [the

Fourth Amendment.]" *Whren v. United States*, 517 U.S. 806, 809-810, 116 S.Ct. 1769, 1772, 135 L.Ed.2d 89, 95 (1996)(citations omitted).

3. Trooper Berkebile, based upon the objective factor of his timing of the speed of the Defendant's Malibu for 3/10 of a mile, possessed probable cause to conduct a traffic stop of that vehicle for a violation of the Pennsylvania law prohibiting operating a motor vehicle in excess of the maximum speed limits and during such stop, a review of the Defendant's license and registration was permissible. *See U.S. v. Velasquez*, 885 F.2d 1076, 1081 (3d Cir. 1989).

4. After the return of the Defendant's paperwork and the giving of a written warning by Trooper Berkebile, the traffic stop was terminated and Trooper Berkebile's reinitiated contact with the Defendant constituted a consensual mere encounter.

5. Trooper Berkebile did not in any way convey that the Defendant was required to comply with his request for questioning and a seizure of the Defendant's person did not occur by the fact that the Defendant was asked if he would answer the Trooper's questions. *See Florida v. Bostick*, 501 U.S. 429, 434-435, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389, 398-399 (1991).

6. The Defendant consented to the answering of questions from Trooper Berkebile rather than refusing to speak to Trooper Berkebile.

7. In considering the totality of the circumstances, a seizure of the Defendant did not occur before or during Trooper Berkebile's questioning as a reasonable person would have felt "free to leave." *US v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497, 509 (1980); *Bostick* at 435, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389, 399. Trooper Berkebile therefore did not conduct a custodial interrogation when he commented to the Defendant about the smell of marijuana coming from the Malibu.

8. In response to Trooper Berkebile's comment, the Defendant produced a burnt "blunt" from his sock and related that he had smoked it while previously driving.

9. At that point, Trooper Berkebile possessed the knowledge of "facts and circumstances...of which [he] had reasonably trustworthy information [that] was sufficient to warrant a prudent man in believing that the [defendant] had committed or was committing an offense." *Beck v. State of Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142, 145 (1964)(citations omitted) *See also U.S. v. Myers*, 308 F.3d 251, 255 (3d Cir. 2002); that is to say that Trooper Berkebile had probable cause to arrest the Defendant for possession of a controlled substance (marijuana) and for driving under the

influence of a controlled substance in violation of Pennsylvania law because of his voluntary admission and production of the marijuana "blunt."

10. In consideration of the totality of the circumstances surrounding the Defendant's oral waiver of rights, the Defendant "voluntarily, knowingly and intelligently" waived his *Miranda* rights for the purpose of speaking to Trooper Volk at Somerset Hospital. *See Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410, 421 (1986); *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed. 2d 694, 707 (1966).

11. In considering the Defendant's challenge to the admissibility of his statements made during the second interview of him at the State Police barracks, the Court utilizes the two prong test of *United States v. Pruden*, 398 F.3d 241, 246-247 (3d Cir. 2005) which asks:

> (1) At the time the *Miranda* warnings were provided, did the defendant know and understand his rights? (2) Did anything occur between the warnings and the statement, whether the passage of time or other intervening event, which rendered the defendant unable to consider fully and properly the effect of an exercise or waiver of those rights before making a statement to law enforcement officers?

12. In answering the first question, the Court determines that the Defendant knew and understood his rights when they were read to him at Somerset Hospital.

13. However, after a review of the totality of the circumstances, the Court finds that the Defendant's waiver of *Miranda* rights at Somerset Hospital was not effective for the subsequent interview of the Defendant by Trooper Walker at the Somerset State Police Barracks because of several intervening events and circumstances: 1) at the point of the second interview, the criminal charges against the Defendant were escalating as a result of the search of the Defendant's Malibu from simple possession of a small amount of marihuana (35 P.S. § 780-113(31)), a misdemeanor (35 P.S. § 780-113(g)), and driving under the influence of a controlled substance (75 Pa.C.S.A. § 3802(d)), a misdemeanor (75 Pa.C.S.A. § 3803(a)(1)) to possession with intent to deliver a controlled substance (35 P.S. § 780-113(a)(30), a felony (35 P.S. § 780-113 (f)(2)); 2) the location of the interview had changed; 3) the Defendant was interviewed by a different law enforcement officer, Trooper Walker, than the officer who read him the *Miranda* warnings and previously interviewed him; 4) the Defendant's only previous experience with the criminal justice system occurred through an unknown, undated previous arrest for drug

related charges, [1]; 5) although questioned regarding the same subject matter, the statements of the Defendant differed as the initial statement at the Somerset Hospital alleged that he was coming from a funeral of an unnamed friend and denied possessing "raw" marijuana[2] and the Defendant's second statement at the State Police barracks contained admissions of going to Philadelphia to purchase raw marijuana, not for a funeral, and that he was going to sell the marijuana for his own profit and not reveal his Philadelphia supplier; and 6) a four hour lapse between interviews.[3] *See generally United States v. Vasquez*, 889 F.Supp. 171, 177 (M.D.Pa. 1995)(listing five factors commonly used by Pennsylvania courts in evaluating the staleness of a waiver[4]) and *United States v. Smith*, 679 F.Supp. 410, 413 (D.Del. 1988)(finding that lapse of two and one-half hours where subject was transported from one location to two further locations and interviewed by the same officers about the same subject matter did not invalidate previous *Miranda* warnings). *See also U.S. v. Marc*, 1997 WL 129324 at *9 (D.Del. 1997)(suppressing statement after ten hour lapse, change in location, change in interviewing officer and escalation of charges and significant change in statements)

---

[1] The Defendant argues that this is a "1995 juvenile arrest for two drug charges, disposition unreported" but nowhere in the testimony or exhibit submitted to the Court is this fact found. Defendant's Post-Hearing Brief, pp. 2-3.

[2] Although the search warrant found at Government Exhibit 1, indicated that the Defendant was "putting his head down in defeat" and did not disagree with Trooper Volk when he suggested to the Defendant that "raw" marijuana was in the Defendant's Malibu and such smell was "baked" on the Defendant, the Court does not accept this as a "tacit" admission because the Government has failed to prove the necessary elements of such at the Suppression hearing. *See* F.R.E. 801(d)(2)(b).

[3] The lapse of four hours alone does not invalidate the *Miranda* warnings given in the case *sub judice*, but when coupled with the intervening events explains to some extent the change of locations and the arrival of a different interviewer because that interviewer was brought in after the discovery of a certain amount of controlled substances (T. pp. 24, 54).

[4] These five factors are:

(1) the time lapse between the last *Miranda* warnings and the appellant's statement; (2) interruptions in the continuity of the interrogation; (3) whether there was a change of location between the place where the last *Miranda* warnings were given and the place where the appellant's statement was made; (4) whether the same officer who gave the warnings also conducted the interrogation resulting in the appellant's statement; and (5) whether the statement elicited during the complained-of interrogation differed significantly from other statements which had been preceded by *Miranda* warnings.

*United States v. Vasquez*, 889 F.Supp. 171, 177 (M.D.Pa. 1995).

14. "[T]he Court cautions officials not to rely on warnings given by another official at an earlier time. The earlier warnings could be found ineffective or intervening events could invalidate them. Law enforcement officials can quickly and easily reiterate the warnings and avoid these risks." *U.S. v. Smith*, 679 F.Supp. 410, 413 (D.Del. 1988).

15. A dog sniff of a lawfully stopped vehicle does not amount to a search under the Fourth Amendment. See *Illinois v. Caballes*, 543 U.S. 405, 409, 125 S.Ct. 834, 838, 160 L.Ed. 2d 842, 847 (2005); *City of Indianapolis v. Edmond*, 531 U.S. 32, 40 121 S.Ct. 447, 453, 148 L.Ed.2d 333, 342-343 (2000).

16. A district court's review of the issuance of a search warrant is not a de novo review, but a review requiring that the issuance of a search warrant be upheld if "there is a substantial basis for a fair probability that the evidence will be found." *United States v. Conley*, 4 F.3d 1200, 1205 (3d Cir. 1993).

17. There exists a substantial basis for the district justice's finding of probable cause for the issuance of a search warrant with regard to the Malibu as the affidavit of probable cause in this matter included various information regarding the Defendant and the observations of the troopers investigating him, including the following information: Trooper Berkebile smelled raw marijuana emanating from the Defendant's Malibu, the Defendant admitted to smoking marijuana, the Defendant has a previous arrest for drug-related charges, the viewing of and Defendant's admission of possessing three cellular telephones in his Malibu (a circumstance frequently present in situations involving drug distributors and persons transporting drugs), there was a positive indication on the vehicle by a K-9 drug dog for a controlled substance and that the Defendant could not remember the name of his friend whose funeral he claimed to have attended. Government's Exhibit 1.

Therefore, the Court will grant in part the Defendant's Motion to Suppress as to the Defendant's statements made in response to the questioning of the Defendant by Trooper Edward Walker conducted at the Somerset State Police Barracks on July 28, 2004, and deny in part the Defendant's Motion to Suppress as to all of the Defendant's remaining arguments.

**AND NOW,** this 28th day of February, 2006, this matter coming before the Court on the Defendant's Motion to Suppress Evidence (Document No. 22), and after an evidentiary hearing thereon, IT IS HEREBY ORDERED THAT the Defendant's Motion is GRANTED IN PART as to any statements made by the Defendant in response to questioning conducted by Pennsylvania State Police Trooper Edward Walker on July 28, 2004 at the Somerset State Police Barracks and DENIED IN PART as to all other arguments made in the Defendant's Motion.

BY THE COURT:

*/s/ Kim R. Gibson*

**KIM R. GIBSON,**
**UNITED STATES DISTRICT JUDGE**
